Elaine T. Byszewski (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
E-mail: elaine@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Andrew M. Volk (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: andrew@hbsslaw.com

Mark P. Robinson, Jr. (SBN 054426)
Kevin F. Calcagnie (SBN 108994)
Scot D. Wilson (SBN 223367)
ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
mrobinson@rcrsd.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNA ANDREWS, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>GENERAL MOTORS LLC,<br><br>    Defendant. | Case No.: 5:14-cv-1239<br><br>**<u>CLASS ACTION</u>**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION AND VENUE ............................................. 8

III.  PARTIES ............................................................................. 8

IV.   FACTUAL ALLEGATIONS ................................................. 9

      A.    GM Promoted All of its Vehicles as Safe, Reliable and High Quality ................................................................. 9

      B.    There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years and, Until Recently, GM Concealed Them from Consumers ............................................. 18

            1.    The ignition switch defects. ........................................ 19

            2.    The power steering defect. ........................................ 24

            3.    Airbag defect. ........................................................... 25

            4.    The brake light defect. .............................................. 29

            5.    Shift cable defect. ..................................................... 32

            6.    Safety belt defect. ..................................................... 35

            7.    Ignition lock cylinder defect. .................................... 35

            8.    The Camaro's Key Design Defect ............................. 36

            9.    The ignition key defect. ............................................ 36

            10.   At least 26 other defects were revealed by GM in recalls during the first five and one-half months of 2014. ......... 37

      C.    GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees to Conceal Safety Issues .......................... 43

      D.    GM's Fraudulent Concealment of the Defects Has Harmed Plaintiff and the Class ............................................. 48

V.    TOLLING OF THE STATUTES OF LIMITATION ............... 50

VI.   CLASS ALLEGATIONS ...................................................... 50

      A.    The Nationwide Class ................................................. 50

010440-11  693457 V1

B.     California Class ...................................................................................... 55

VII.   CAUSES OF ACTION ............................................................................... 58

     A.     Nationwide Class Claim .................................................................. 58

     COUNT I:  FRAUDULENT CONCEALMENT ....................................... 58

     B.     California Class Claims .................................................................... 60

     COUNT II:  VIOLATIONS OF THE CONSUMER LEGAL
     REMEDIES ACT  (CAL. CIV. CODE § 1750, *ET SEQ.*) ................................ 60

     COUNT III:  VIOLATION OF THE CALIFORNIA UNFAIR
     COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200,
     *ET SEQ.*) ................................................................................................. 64

VIII.  PRAYER FOR RELIEF ............................................................................. 67

IX.    JURY TRIAL DEMAND .............................................................................. 67

010440-11  693457 V1

Plaintiff Anna Andrews, individually and as class representative on behalf of all similarly situated persons and the general public, brings this action against Defendant General Motors LLC ("Defendant" or "GM") and alleges as follows:

## I.    INTRODUCTION

1.    GM led the world and US consumers to believe that after bankruptcy it was a new company.  GM repeatedly proclaimed that it was a company committed to innovation, safety, and maintaining a strong brand, as in its 2012 Annual Report:



2.    GM was successful.  Sales of all its models went up and GM became profitable.  Seemingly a new GM was born and the GM brand once again stood strong in the eyes of consumers.  Or so the world thought.

010440-11  693457 V1

3.      GM's image was an illusion.  This case arises from GM's egregious failure to disclose, and the affirmative concealment of, at least 35 separate known defects in GM-branded vehicles.  By concealing the existence of the many known defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," and claiming that it built the "world's best vehicles," GM enticed Plaintiff and all GM vehicle purchasers to buy vehicles that have now diminished in value as the truth about the GM brand has come out, and a stigma has attached to all GM-branded vehicles.

4.      A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise similar vehicle made by a disreputable manufacturer that is known to devalue safety and to conceal serious defects from consumers and regulators.  GM Vehicle Safety Chief, Jeff Boyer, recently stated that:  "Nothing is more important than the safety of our customers in the vehicles they drive."  Yet GM failed to live up to this commitment, instead choosing to conceal at least 35 serious defects in over 17 million GM-branded vehicles sold in the United States, and the value of all GM vehicles has diminished as a result of the widespread publication of those defects, GM's concealment of those defects, and a seemingly never-ending series of recalls in the first half of 2014.

5.      The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect.  In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to ***never*** use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

6.      Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act")[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2]  If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.[3]

7.      In the Purchase Agreement through which it acquired Old GM's assets, GM *explicitly assumed* the responsibilities to report safety defects with respect to the vehicles sold by Old GM as required by the TREAD ACT.

8.      When a manufacturer with TREAD Act responsibilities is aware of safety defects and fails to disclose them as GM has done, that manufacturer's vehicles are not safe.  And when that manufacturer markets and sells its new vehicles by touting that its vehicles are "safe," as GM has also done, that manufacturer is engaging in deception.

9.      GM has recently been forced to disclose that it had been concealing a staggering and unprecedented number of known safety defects in GM-branded vehicles ever since its inception in 2009, and other defects arose on its watch apparently due in large measure to GM's focus on cost-cutting over safety, its discouragement of raising safety issues and its training of employees to avoid using language such as "stalls," "defect" or "safety issue" in order to avoid attracting the attention of regulators.  As a result, GM has been forced to recall over 17 million vehicles in some 40 recalls covering 35 separate defects during the first five and one-half months of this year – 25% more recalls than in a normal complete year and almost 20 times more than during the same period in 2013.  The cumulative negative

---

[1] 49 U.S.C. §§ 30101-30170.

[2] 49 U.S.C. § 30118(c)(1) & (2).

[3] 49 U.S.C. § 30118(b)(2)(A) & (B).

- 3 -

effect on the value of the vehicles sold by GM has been both foreseeable and significant.

10.     The array of defects is astounding and includes:  (1) ignition switch defect, (2) power steering defect, (3) airbag defect (4) brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect, (8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19) acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22) brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect, (25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31) front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect, (33) sonic turbine shaft, (34) electrical system defect, and (35) seatbelt tensioning system defect.

11.     GM has received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects.  Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to GM, GM was aware of the now infamous ignition switch defect (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 10, 2009*.

12.     Yet, despite the dangerous nature of many of the defects and their effects on critical safety systems, GM concealed the existence of the defects and failed to begin to remedy the problems from the date of its inception until this year.

13.     In February and March of 2014, GM issued three recalls for a combined total of 2.19 million vehicles with a dangerous ignition switch defect that causes

010440-11  693457 V1

vehicles to shut down during ordinary driving conditions, causing stalls, the loss of power-steering and power-brakes, and the non-deployment of airbags in the event of a collision. GM knew about this defect for years before it was finally forced to act to remedy this highly dangerous defect that has led to at least 13 deaths – and probably many more.

14. GM's now highly publicized campaign of deception in connection with the ignition switch defect sent shockwaves throughout the country, and jump-started the ever-burgeoning erosion of consumer confidence in the GM brand.

15. On May 16, 2014, GM entered a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the ignition switch defect, and agreed to pay the maximum available civil penalties for its violations.

16. Unfortunately for all owners of vehicles sold by GM, the ignition switch defect was only one of a seemingly never-ending parade of recalls in the first half of 2014 – many concerning safety defects that had been long known to GM.

17. Between 2003 and 2010, over 1.3 million GM-branded vehicles were sold in the United States with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power steering defect").

18. As with the ignition switch defect, GM was aware of the power steering defect from the date of its inception, and concealed the defect for years.

19. From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in the United States with defective wiring harnesses. Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash (the "airbag defect"). The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

- 5 -

20.     Once again, GM knew of the dangerous airbag defect for years, but chose instead to conceal the defect, and marketed its vehicles as "safe" and "reliable."

21.     To take just one more example, between 2003 and 2012, some 2.4 million GM-branded vehicles were sold in the United States with a wiring harness defect that could cause brake lamps to fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not engaged (the "brake light defect"). The same defect could also disable traction control, electronic stability control, and panic braking assist operations. Though GM received hundreds of complaints and was aware of at least 13 crashes caused by this defect, it waited until May 2014 before finally ordering a full recall.

22.     GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process…, and terrible things happened." But that admission is cold comfort for Plaintiff and the Class, whose vehicles have diminished in value as a result of GM's deception.

23.     This case arises from GM's breach of its obligations and duties to its customers to make truthful and full disclosures concerning its vehicles – particularly, the safety and reliability of its vehicles and the importance of safety to the Company. GM's false representations of the safety and reliability of its vehicles, and its concealment of a plethora of known safety defects plaguing its vehicles and its brand, caused Plaintiff and the Class to purchase GM vehicles under false pretenses.

24.     From its inception in 2009, GM has known of many of the defects that exist in over 17 million GM-branded vehicles sold in the United States. But to maintain and boost consumer confidence in the brand in order to sell vehicles, and to avoid remediation costs and negative publicity that would hurt sales, GM concealed the defects and encouraged unsuspecting car purchasers to buy its vehicles. All the while, GM touted its vehicles as "safe" and "reliable," and claimed to be a responsible manufacturer that valued safety and stood behind its vehicles after they are sold.

010440-11  693457 V1

25. Plaintiff brings this action for a Class of all persons in the United States who either (i) own or lease a new or used GM-branded vehicle sold between July 10, 2009, and April 1, 2014 (the "Affected Vehicles"), or (ii) sold an Affected Vehicle at a diminished price on or after April 1, 2014. Excluded from the Class are owners and lessors of model year 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys, whose vehicles were recalled for an ignition switch defect.

26. In addition to her nationwide class claim against GM for fraudulent concealment, Plaintiff also brings claims against GM under the laws of the State of California, for a Class of California residents who either (i) own or lease one or more of the Affected Vehicles, or (ii) sold an Affected Vehicle on or after April 1, 2014.

27. Plaintiff and the Class have been damaged by GM's misrepresentations, concealment, and non-disclosure of the numerous defects plaguing over 17 million GM-branded vehicles. Now that the truth is emerging, and consumers are aware that GM concealed known safety defects in many models and years of its vehicles, and that the Company de-valued safety and systemically encouraged its employees to conceal serious defects, the entire brand is greatly tarnished as it is clear that the Company is untrustworthy and does not stand behind its vehicles. The value of the Affected Vehicles has therefore greatly diminished because of GM's failure to timely disclose and remedy the many serious defects in GM-branded vehicles. For example, the 2010 and the 2011 Chevrolet Camaro have both seen a diminished value between February 2014, the pre-brand damage to reputation period, of $2,000, after the truth of GM's safety and culture was exposed. The 2009 Pontiac Solstice has diminished $2,900 during the same time. GM's egregious and widely publicized conduct and the never-ending and piecemeal nature of GM's recalls has so tarnished the Affected Vehicles that no reasonable consumer would have paid the price they did when the GM brand meant safety and success.

## II.    JURISDICTION AND VENUE

28.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendant.

29.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

30.    Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.    PARTIES

31.    Plaintiff and proposed Nationwide and California State Class Representative Anna Andrews is a resident and citizen of La Quinta, CA.  She purchased a used 2010 Buick LaCrosse in Cathedral City, CA on August 25, 2011.  Ms. Andrews purchased her LaCrosse in part because she wanted a safely designed and manufactured vehicle.  She further believed that GM was a reputable manufacturer of safe and reliable vehicles, and that the Company stands behind its vehicles once they are on the road.  Plaintiff did not learn of the many defects in GM-branded vehicles until shortly before filing this lawsuit.  Had GM disclosed the many defects in GM-branded vehicles, Plaintiff would either not have purchased her LaCrosse, or would have paid less than she did.

32.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain

liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33. Among the liabilities and obligations expressly assumed by GM are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

## IV.   FACTUAL ALLEGATIONS

**A.   GM Promoted All of its Vehicles as Safe, Reliable and High Quality**

34. GM told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

35. It represented that it was building vehicles with design excellence, quality, and performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality and performance, including the Holden Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse in China and many others.

> The company's progress is early evidence of a new business model that begins and ends with great vehicles.  We are leveraging our global resources and scale to maintain stringent cost management while taking advantage of growth and revenue opportunities around the world, to

- 9 -

ultimately deliver sustainable results for all of our shareholders.

36.     The theme below was repeated in advertisements, company literature, and material at dealerships as the core message about GM's Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins— and ultimately deliver more cash to invest in our future vehicles.

# A New Vision,
## a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

37.    GM represented that it had a world-class lineup in North America:



**Chevrolet Cruze**
Global success is no surprise for the new Chevrolet Cruze, which is sold in more than 60 countries around the world. In addition to a 42 mpg Eco model (sold in North America), Cruze's globally influenced design is complemented by its exceptional quietness, high quality and attention to detail not matched by the competition.

**Buick Regal**
The sport-injected Buick Regal is the brand's latest addition, attracting a whole new demographic for the Buick brand. The newly designed Buick lineup, which saw 52 percent volume growth in 2010 in the United States alone, is appealing to a broader spectrum of buyers.

  

**Chevrolet Equinox**
The Chevrolet Equinox delivers best-in-segment 32-mpg highway fuel economy in a sleek, roomy new package. With the success of the Equinox and other strong-selling crossovers, GM leads the U.S. industry in total unit sales for the segment.

**Chevrolet Sonic**
Stylish four-door sedan and sporty five-door hatchback versions of the Chevrolet Sonic will be in U.S. showrooms in fall 2011. Currently the only small car built in the United States, it will be sold as the Aveo in other parts of the world.

**Buick LaCrosse**
Buick builds on the brand's momentum in the United States and China with the fuel-efficient LaCrosse. With eAssist technology, the LaCrosse achieves an expected 37 mpg on the highway.

**Buick Verano**
The all-new Buick Verano, which will be available in late 2011, appeals to customers in the United States, Canada and Mexico who want great fuel economy and luxury in a smaller but premium package.

   



**GMC Terrain**
The GMC Terrain delivers segment-leading fuel economy of 32 mpg highway, plus uncompromising content and premium technology, in a 5-passenger, compact SUV.



**Cadillac CTS V-Coupe**
Cadillac's new CTS V-Coupe is the complete package for the driving enthusiast—a 556 hp supercharged V-8 engine, stunning lines and performance handling.



**GMC Sierra Heavy Duty**
The GMC Sierra offers heavy-duty power and performance with the proven and powerful Duramax Diesel/Allison Transmission combination and a completely new chassis with improved capabilities and ride comfort.



**GMC Yukon Hybrid**
The GMC Yukon Hybrid is America's first full-sized SUV hybrid, with city fuel economy of 20 mpg—better than a standard 6-cylinder Honda Accord and 43 percent better than any full-size SUV in its class.



**Cadillac CTS Sport Wagon**
With an available advanced direct-injected V6 engine, the Cadillac CTS Sport Wagon sets a new standard for versatility, while offering excitement and purpose.



**Cadillac SRX**
The Cadillac SRX looks and performs like no other crossover, with a cockpit that offers utility and elegance and an optional 70-inch Ultraview sunroof.

38.    It boasted of its new "culture":



A New Attitude

We are making major strides in becoming a GM
that works smart, thinks big and moves fast.
The new GM culture values simplicity, agility and
action—making and implementing decisions
faster, pushing accountability deeper into the
organization and demanding results from everyone.
There's never been a greater need to change,
and there's never been a better time.

39.    In its 2012 Annual Report, GM told the world the following about its
brand:

What is immutable is our focus on the customer, which
requires us to go from "good" today to "great" in everything
we do, including product design, initial quality, durability
and service after the sale.

010440-11  693457 V1

40.     GM also indicated it had changed its structure to create more "accountability" which, as shown below, was a blatant falsehood:

> That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.

41.     And GM represented that product quality was a key focus – another blatant falsehood:

> Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.

42.     In its 2013 Letter to Stockholders, GM noted that its brand had grown in value and that it designed the "World's Best Vehicles":

> Dear Stockholder:
>
> Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.
>
> • GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.
>
> Design, Build and Sell the World's Best Vehicles
>
> This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own.  When we get this right, it transforms our reputation and the company's bottom line.
>
> Strengthen Brand Value
>
> Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth.  They are Chevrolet, which

- 14 -

embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.

Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.

43. Once it emerged from bankruptcy, GM told the world it was a new and improved company:





This is
the New GM.

General Motors Company
2010 Annual Report

44.     In advertisements and Company literature, GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.

45.     For example, a radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

46.     An online ad for "GM certified" used vehicles that ran from July 6, 2009, until April 5, 2010, stated that "GM certified means no worries."

47.     GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

48.     Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

49.     An online national ad campaign for GM in April 2012 stressed "Safety. Utility. Performance."

50.     A national print ad campaign in April 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power, performance and safety."

51.     A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

52.     GM's website, GM.com, states:

> Innovation: Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification. Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort and noise minimization

> before you think about them. The same quality process
> ensures our safety technology performs when you need it.

53. On February 25, 2014, GM North America President, Alan Batey, publically stated: "Ensuring our customers' safety is our first order of business. We are deeply sorry and we are working to address this issue as quickly as we can."

54. GM made these and similar representations to boost vehicle sales while knowing that millions of GM-branded vehicles, across numerous models and years, were plagued with serious and concealed safety defects.

55. Ever since its inception, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of GM-branded vehicles and the existence of the defects in those vehicles.

56. GM continues to make misleading safety and reliability claims in public statements, advertisements, and literature provided with its vehicles.

**B.      There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years and, Until Recently, GM Concealed Them from Consumers**

57. In the first five and one-half months of 2014, GM has already announced some 40 recalls affecting over 17 million GM-branded vehicles from model years 2003-2014. The recalls concern 35 separate defects. The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion: GM and its predecessor sold a large number of unsafe vehicle models with myriad defects during a long period of time.

58. Even more disturbingly, the available evidence shows a common pattern: From its inception in 2009, GM knew about an ever-growing list of serious safety defects in millions of GM-branded vehicles, but concealed them from consumers and regulators in order to cut costs, boost sales, and avoid the cost and publicity of recalls.

59. GM inherited from Old GM a company that valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words like "stall" that might attract the attention of NHTSA and

suggest that a recall was required, and trained its employees to avoid the use of words such as "defect" or "problem" that might flag the existence of a safety issue. GM did nothing to change these practices.

60.    The Center for Auto Safety recently stated that it has identified 2,004 death and injury reports filed by GM with federal regulators in connection with vehicles that have recently been recalled.[4] Most or all of these deaths and injuries would have been avoided had GM complied with its TREAD Act obligations over the past five years.

61.    The many defects concealed by GM affected key safety systems in GM vehicles, including the ignition, power steering, airbags, brake lights, gear shift systems, and seatbelts.

62.    The available evidence shows a consistent pattern: GM learned about a particular defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided upon a "root cause." GM then took minimal action – such as issuing a carefully worded "Technical Service Bulletin" to its dealers, or even recalling a very small number of the vehicles with the defect. All the while, the true nature and scope of the defects were kept under wraps, vehicles affected by the defects remained on the road, and GM enticed Class members to purchase its vehicles by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer that stands behind its products.

63.    The nine defects affecting the greatest number of vehicles are discussed in some detail below, and the remainder are summarized thereafter.

**1.    The ignition switch defects.**

64.    The ignition switch defects can cause the vehicle's engine and electrical systems to shut off, disabling the power steering and power brakes and causing non-

---

[4] *See Thousands of Accident Reports Filed Involving Recalled GM Cars: Report*, Irvin Jackson (June 3, 2014).

deployment of the vehicle's airbag and the failure of the vehicle's seatbelt pretensioners in the event of a crash.

65.     The ignition switch systems at issue are defective in at least three major respects.  The first is that the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" or "off" position.  The second defect is that, due to the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  The third defect is that the airbags immediately become inoperable whenever the ignition switch moves from the "run" to the "accessory" position – even when the vehicle is travelling at highs speeds.

66.     Vehicles with defective ignition switches are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

67.     Alarmingly, GM knew of the deadly ignition switch defects and their dangerous consequences from the date of its inception on July 10, 2009, but concealed its knowledge from consumers and regulators.

68.     In part, GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once GM took over from Old GM.  For example, the Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Ray DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch crisis.  Later in 2014, in the wake of the GM Report,[5] Mr. DeGiorgio was fired.

---

[5] References to the "GM Report" are to the *Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*," Anton R. Valukas, Jenner & Block (May 29, 2014).

69.     Mr. DeGiorgio actively concealed the defect while working for GM.

70.     Similarly, Gary Altman was the program-engineering manager for the Cobalt, which is one of the models with the defective ignition switches and hit the market in MY 2005.  He remained as an engineer at GM until he was suspended on April 10, 2014, by GM for his role in the ignition switch problem and then fired in the wake of the GM Report.

71.     Mr. Altman recently admitted that engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the vehicle that could cause vehicles to stall, and disable power steering and power brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

72.     Incredibly, GM now claims that it did not view vehicle stalling and the loss of power steering as a "safety issue," but only as a "customer convenience" issue.[6]  GM bases this claim on the equally incredible assertion that, at least for some period of time, it was not aware that when the ignition switch moves to the "accessory" position, the airbags become inoperable – even though Old GM itself designed the airbags to not deploy under that circumstance.[7]

73.     Even crediting GM's claim that some at the Company were unaware of the rather obvious connection between the defective ignition switches and airbag non-deployment, a stall and loss of power steering and power brakes is a serious safety issue under any objective view.  GM itself recognized in 2010 that a loss of power steering standing alone was grounds for a safety recall, as it did a recall on such grounds.

74.     In fact, as multiple GM employees confirm, GM intentionally avoids using the word "stall" "because such language might draw the attention of NHTSA"

---

[6] GM Report at 2.

[7] *Id*.

- 21 -

and "may raise a concern about safety, which suggests GM should recall the vehicle…."[8]

75. GM continued to receive reports of deaths in Cobalts involving steering and/or airbag failures from its inception up through the present, and now admits that at least 13 deaths are attributable to the ignition switch defects. The actual number is believed to be much higher.

76. In April 2006, the GM design engineer who was responsible for the ignition switch in the recalled vehicles, Design Research Engineer Ray DeGiorgio, authorized part supplier Delphi to implement changes to fix the ignition switch defect.[9] The design change "was implemented to increase torque performance in the switch."[10] However, testing showed that, even with the proposed change, the performance of the ignition switch was still below original specifications.[11] *Yet no recall occurred.*

77. Modified ignition switches – with greater torque – started to be installed in 2007 model/year vehicles.[12] In what former GM engineers now term a "cardinal sin" and "an extraordinary violation of internal processes," when Mr. DiGiorgio changed the part design *he kept the old part number*.[13] That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

---

[8] GM Report at 92-93.

[9] General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201. *See also* GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[10] *Id.*

[11] Delphi Briefing, Mar. 27, 2014.

[12] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[13] "'*Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol*," *Automotive News* (Mar. 26, 2014).

78.     In October 2012, Mr. DeGiorgio sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating:  "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[14]

79.     The October 2012 email makes clear that GM considered implementing a recall to fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to save money.

80.     Eventually, in the face of pressure from regulators and personal injury litigants, the defect could no longer be ignored or swept under the rug.  After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the vehicles with defective ignition switches on January 31, 2014.

81.     Initially, the EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

82.     After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

83.     Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

84.     All told, GM has recalled some 2.19 million vehicles in connection with the ignition switch defect.

85.     Based on its egregious conduct in concealing the ignition switch defect, GM recently agreed to pay the maximum possible civil penalty in a Consent Order

---

[14] GMHEC000221539.

- 23 -

1  with the National Highway Traffic Safety Administration ("NHTSA") and admitted

2  that it had violated its legal obligations to promptly disclose the existence of known

3  safety defects.

4  **2.     The power steering defect.**

5  86.     Between 2003 and 2010, over 1.3 million GM-branded vehicles in the

6  United States were sold with a safety defect that causes the vehicle's electric power

7  steering ("EPS") to suddenly fail during ordinary driving conditions and revert back

8  to manual steering, requiring greater effort by the driver to steer the vehicle and

9  increasing the risk of collisions and injuries.

10  87.     As with the ignition switch defects, GM was aware of the power steering

11  defect long before it took anything approaching full remedial action.

12  88.     When the power steering fails, a message appears on the vehicle's

13  dashboard, and a chime sounds to inform the driver.  Although steering control can be

14  maintained through manual steering, greater driver effort is required, and the risk of

15  an accident is increased.

16  89.     In 2010, GM first recalled Chevy Cobalt and Pontiac G5 models for

17  these power steering issues, yet it did not recall the many other vehicles that had the

18  very same power steering defect.

19  90.     Documents released by NHTSA show that GM waited years to recall

20  nearly 335,000 Saturn Ions for power steering failure – despite receiving nearly 4,800

21  consumer complaints and more than 30,000 claims for warranty repairs.  That

22  translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty

23  claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a

24  complaint rate of 250 complaints per 100,000 vehicles.[15]  Here, the rate translates to

25  1430 complaints per 100,000 vehicles.

26

27  ---

[15] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-
28  results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

- 24 -

91.     In response to the consumer complaints, in September 2011, NHTSA opened an investigation into the power steering defect in Saturn Ions.

92.     NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

93.     NHTSA linked approximately 12 crashes and two injuries to the power steering defect in the Ions.

94.     In 2011, GM missed yet another opportunity to recall the additional vehicles with faulty power steering when CEO Mary Barra – then head of product development – was advised by engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions. Ms. Barra was also informed of the ongoing NHTSA investigation. At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in GM's 2005 steering recall of Cobalt and G5 vehicles.

95.     Yet GM took no action for four years. It wasn't until March 31, 2014, that GM finally recalled the approximately 1.3 million vehicles in the United States affected by the power steering defect.

96.     After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models previously for the same issue, but that GM "did not do enough."

### 3.     Airbag defect.[16]

97.     From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles in the United States were sold with defective wiring harnesses. Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash. The vehicles' failure to deploy airbags

---

[16] This defect is distinct from the airbag component of the ignition switch defect discussed above and from other airbag defects affecting a smaller number of vehicles, discussed below.

and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

98.     Once again, GM knew of the dangerous airbag defect long before it took anything approaching the requisite remedial action.

99.     As the wiring harness connectors in the SIABs corrode or loosen over time, resistance will increase. The airbag sensing system will interpret this increase in resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard. This message may be intermittent at first and the airbags and pretensioners will still deploy. But over time, the resistance can build to the point where the SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[17]

100.    The problem apparently arose when GM made the switch from using gold-plated terminals to connect its wire harnesses to cheaper tin terminals in 2007.

101.    In June 2008, Old GM noticed increased warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring. After analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. It released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also began the transition back to gold-plated terminals in certain vehicles. At that point, Old GM suspended all investigation into the defective airbag wiring and took no further action.[18]

102.    In November 2009, GM learned of similar reports of increased airbag service messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After

---

[17] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

[18] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

010440-11  693457 V1

investigation, GM concluded that corrosion and wear in the same tin connector was the root of the airbag problems in the Malibu and G6 models.[19]

103.   In January 2010, after review of the Malibu and G6 airbag connector issues, GM concluded that ignoring the service airbag message could increase the resistance such that a SIAB might not deploy in a side impact collision.  On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[20]

104.   From February to May 2010, GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims.  This led GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."  On November 23, 2010, GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and re-route or replace the SIAB connectors.[21]

105.   GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[22]

106.   But in 2012, GM noticed another spike in the volume of warranty claims relating to SIAB connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the

---

[19] *See id.* at 2.

[20] *See id*.

[21] *See id*. at 3.

[22] *See id*.

- 27 -

connector terminal was causing increased system resistance. In response, GM issued an internal bulletin for 2011-12 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[23]

107. The defect was still uncured, however, because in 2013 GM again marked an increase in service repairs and buyback activity due to illuminated airbag service lights. On October 4, 2013, GM opened an investigation into airbag connector issues in 2011-2013 Buick Enclave, Chevy Traverse, and GMC Acadia models. The investigation revealed an increase in warranty claims for vehicles built in late 2011 and early 2012.[24]

108. On February 10, 2014, GM concluded that corrosion and crimping issues were again the root cause of the airbag problems.[25]

109. GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag flaw in the 2010-2013 vehicles. But it wasn't until a call with NHTSA on March 14, 2014, that GM finally issued a full-blown safety recall on the vehicles with the faulty harness wiring – years after it first learned of the defective airbag connectors, after four investigations into the defect, and after issuing at least six service bulletins on the topic. The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[26]

110. On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted with the defective airbag system. The recall instructs dealers to

---

[23] *See id*. at 4.

[24] *See id*.

[25] *See id*. at 5.

[26] *See id*.

remove driver and passenger SIAB connectors and splice and solder the wires together.[27]

### 4. The brake light defect.

111. Between 2004 and 2012, approximately 2.4 million GM-branded vehicles in the United States were sold with a safety defect that can cause brake lamps to fail to illuminate when the brakes are applied or to illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[28]

112. Once again, GM knew of the dangerous brake light defect for years before it took anything approaching the requisite remedial action. In fact, although the brake light defect has caused at least 13 crashes since 2008, GM did not recall all 2.4 million vehicles with the defect until May 2014.

113. The vehicles with the brake light defect include the 2004-2012 Chevrolet Malibu, the 2004-2007 Malibu Maxx, the 2005-2010 Pontiac G6 and the 2007-2010 Saturn Aura.[29]

114. According to GM, the brake defect originates in the Body Control Module ("BCM") connection system. "Increased resistance can develop in the [BCM] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor ("BAS") circuit that can cause service brakes lamp malfunction."[30] The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[31]

---

[27] *See id.*

[28] *See* GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

[29] *Id.*

[30] *Id.*

[31] *Id.*

115. The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[32]

116. GM now acknowledges that the brake light defect "may increase the risk of a crash."[33]

117. As early as September 2008, NHTSA opened an investigation for model year 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver had not depressed the brake pedal and may turn on when the brake pedal was depressed.[34]

118. During its investigation of the brake light defect in 2008, Old GM found elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the BCM C2 connector was the root cause" of the problem.[35] Old GM and its part supplier Delphi decided that applying dielectric grease to the BCM C2 connector would be "an effective countermeasure to the fretting corrosion."[36] Beginning in November 2008, the company began applying dielectric grease in its vehicle assembly plants.[37]

119. On December 4, 2008, Old GM issued a TSB recommending the application of dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx and 2008 Malibu Classic and 2007-2009 Saturn Aura vehicles.[38] One month later, in January 2009, Old GM

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 2.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 3.

[38] *Id.* at 2.

010440-11 693457 V1

recalled only a small subset of the vehicles with the brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[39]

120. Not surprisingly, the brake light problem was far from resolved.

121. In October 2010, GM released an updated TSB regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the BCM C2 connector.[40]

122. In September 2011, GM received an information request from Canadian authorities regarding brake light defect complaints in vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[41]

123. In February 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.[42]

124. In response, GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting corrosion," but that it continued to believe that "fretting corrosion in the BCM C2 connector" was the "root cause" of the brake light defect.[43]

125. In June 2013, NHTSA upgraded its "Recall Query" concerning brake light problems to an "Engineering Analysis."[44]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 3.

[43] *Id.*

[44] *Id.*

126. In August 2013, GM found an elevated warranty rate for BCM C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to BCM C2 connectors at its assembly plants in November 2008.[45] In November 2013, GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[46]

127. Finally, in March 2014, "GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion. As a result, GM determined that additional remedies were needed to address fretting corrosion."[47]

128. On May 7, 2014, GM's Executive Field Action Decision Committee finally decided to conduct a safety recall.

129. According to GM, "Dealers are to attach the wiring harness to the BCM with a spacer, apply dielectric lubricant to both the BCM CR and harness connector, and on the BAS and harness connector, and relearn the brake pedal home position."[48]

130. Once again, GM sat on and concealed its knowledge of the brake light defect, and did not even consider available countermeasures (other than the application of grease that had proven ineffective) until March of this year.

**5. Shift cable defect.**

131. From 2004 through 2010, more than 1.1 million GM-branded vehicles were sold throughout the United States with a dangerously defective transmission shift cable. The shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position. According to GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at 4.

[48] *Id.*

the park brake, the vehicle could roll away and a crash could occur without prior warning."[49]

132.    Yet again, GM knew of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

133.    In May 2011, NHTSA informed GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[50]

134.    Upon reviewing these findings, GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables." GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider.[51]

135.    GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

136.    In March 2012, NHTSA sent GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Auras, Pontiac G6s, and Chevrolet Malibus.[52]

137.    In responding to the Engineering Assessment request, GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables."

---

[49] *See* GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[50] *Id*. at 2.

[51] *Id*.

[52] *Id*.

Similar to their predecessor vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[53]

138.  Finally, on September 13, 2012, the Executive Field Action Decision Committee decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[54]

139.  But the shift cable problem was far from resolved.

140.  In March 2013, NHTSA sent GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[55]

141.  GM continued its standard process of "investigation" and delay.  But by May 9, 2014, GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[56]

142.  Finally, on May 19, 2014, GM's Executive Field Actions Decision Committee decided to conduct a safety recall of more than 1.1 million vehicles with the defective shift cable issue, including the following models and years (as of May 23, 2014):  MY 2007-2008 Chevrolet Saturn; MY 2004-2008 Chevrolet Malibu; MY 2004-2007 Chevrolet Malibu Maxx; and MY 2005-2008 Pontiac G6.

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

**6.    Safety belt defect.**

143.    Between the years 2008-2014, more than 1.4 million GM-branded vehicles were sold with a dangerous safety belt defect.  According to GM, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[57]

144.    On information and belief, GM knew of the safety belt defect long before it issued the recent recall of more than 1.3 million vehicles with the defect.

145.    While GM has yet to submit its full chronology of events to NHTSA, suffice to say that GM has waited some five years before disclosing this defect.  This delay is consistent with GM's long period of concealment of the other defects as set forth above.

146.    On May 19, 2014, GM's Executive Field Action Decision Committee decided to conduct a recall of the following models and years in connection with the safety belt defect:  MY 2009-2014 Buick Enclave; MY 2009-2014 Chevrolet Traverse; MY 2009-2014 GMC Acadia, and MY 2009-2010 Saturn Outlook.

**7.    Ignition lock cylinder defect.**

147.    On April 9, 2014, GM recalled 2,191,014 GM-branded vehicles to address faulty ignition lock cylinders.[58]  Though the vehicles are the same as those affected by the ignition switch defect,[59] the lock cylinder defect is distinct.

148.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition key while the engine is not in the "Off" position.  If the ignition key is removed when the ignition is not in the "Off" position, unintended vehicle motion

---

[57] *See* GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[58] *See* GM Notice to NHTSA dated April 9, 2014.

[59] Namely, MY 2005 -2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

may occur. That could cause a vehicle crash and injury to the vehicle's occupants or pedestrians. As a result, some of the vehicles with faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention.*"[60]

149. On information and belief, GM was aware of the ignition lock cylinder defect for years before finally acting to remedy it.

### 8. The Camaro's Key Design Defect

150. On June 13, 2014, GM recalled more than 500,000 Chevrolet Camaros:

> …because a driver's knee can bump the key fob out of the run position and cause the vehicle to lose power, an issue that has led to at least three crashes.

> GM said it learned of the issue which primarily affects drivers who sit close to the steering wheel, during internal testing it conducted following its massive ignition switch recall earlier this year. GM knows of three crashes that resulted in four minor injuries attributed to this defect.

### 9. The ignition key defect.

151. On June 16, 2014, GM announced a recall of 3.36 million cars due to a problem with keys that can turn off ignitions and deactivate air bags, a problem similar to the ignition switch defects in the 2.19 million cars recalled earlier in the year.

152. The company said that keys laden with extra weight – such as additional keys or objects attached to a key ring – could inadvertently switch the vehicle's engine off if the car struck a pothole or crossed railroad tracks.

153. GM said it was aware of eight accidents and six injuries related to the defect.

154. As early as December 2000, drivers of the Chevrolet Impala and the other newly recalled cars began lodging complaints about stalling with the National Highway Traffic Safety Administration. "When foot is taken off accelerator, car will

---

[60] GM Notice to NHTSA dated April 9, 2014, at 1.

stall without warning," one driver of a 2000 Cadillac Deville told regulators in December 2000. "Complete electrical system and engine shutdown while driving," another driver of the same model said in January 2001. "Happened three different times to date. Dealer is unable to determine cause of failure."

155. The vehicles covered include the Buick Lacrosse, model years 2005-09; Chevrolet Impala, 2006-14; Cadillac Deville, 2000-05; Cadillac DTS, 2004-11; Buick Lucerne, 2006-11; Buick Regal LS and RS, 2004-05; and Chevrolet Monte Carlo, 2006-08.

**10. At least 26 other defects were revealed by GM in recalls during the first five and one-half months of 2014.**

156. The nine defects discussed above – and the resultant 12 recalls – are but a subset of the 40 recalls ordered by GM in connection with 35 separate defects during the first five and one-half months of 2014. The 26 additional defects are briefly summarized in the following paragraphs.

157. <u>**Transmission oil cooler line defect**</u>: On March 31, 2014, GM recalled 489,936 MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015 Chevy Tahoe, and 2015 Chevy Suburban vehicles. These vehicles may have transmission oil cooler lines that are not securely seated in the fitting. This can cause transmission oil to leak from the fitting, where it can contact a hot surface and cause a vehicle fire.

158. <u>**Power management mode software defect**</u>: On January 13, 2014, GM recalled 324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles. When these vehicles are idling in cold temperatures, the exhaust components can overheat, melt nearby plastic parts, and cause an engine fire.

159. <u>**Substandard front passenger airbags**</u>: On March 17, 2014, GM recalled 303,013 MY 2009-2014 GMC Savana vehicles. In certain frontal impact collisions below the air bag deployment threshold in these vehicles, the panel covering the airbag may not sufficiently absorb the impact of the collision. These

vehicles therefore do not meet the requirements of Federal Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."

160. **Light control module defect:** On May 16, 2014, GM recalled 218,214 MY 2004-2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles. In these vehicles, heat generated within the light control module in the center console in the instrument panel may melt the module and cause a vehicle fire.

161. **Front axle shaft defect:** On March 28, 2014, GM recalled 174,046 MY 2013-2014 Chevrolet Cruze vehicles. In these vehicles, the right front axle shaft may fracture and separate. If this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt. If a vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move unexpectedly which can lead to accident and injury.

162. **Brake boost defect:** On May 13, 2014, GM recalled 140,067 MY 2014 Chevrolet Malibu vehicles. The "hydraulic boost assist" in these vehicles may be disabled; when that happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will travel a greater distance before stopping. Therefore, these vehicles do not comply with Federal Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased risk of collision.

163. **Low beam headlight defect:** On May 14, 2014, GM recalled 103,158 MY 2005-2007 Chevrolet Corvette vehicles. In these vehicles, the underhood bussed electrical center (UBEC) housing can expand and cause the headlamp low beam relay control circuit wire to bend. When the wire is repeatedly bent, it can fracture and cause a loss of low beam headlamp illumination. The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

164. **Vacuum line brake booster defect:** On March 17, 2014, GM recalled 63,903 MY 2013-2014 Cadillac XTS vehicles. In these vehicles, a cavity plug on the

brake boost pump connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can have an adverse impact on the vehicle's brakes.

165.  **Fuel gauge defect:**  On April 29, 2014, GM recalled 51,460 MY 2014 Chevrolet Traverse, GMC Acadia and Buick Enclave vehicles.  In these vehicles, the engine control module ("ECM") software may cause inaccurate fuel gauge readings. An inaccurate fuel gauge may result in the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

166.  **Acceleration defect:**  On April 24, 2014, GM recalled 50,571 MY 2013 Cadillac SRX vehicles.  In these vehicles, there may be a three- to four-second lag in acceleration due to faulty transmission control module programming.  That lag may increase the risk of a crash.

167.  **Flexible flat cable airbag defect:**  On April 9, 2014, GM recalled 23,247 MY 2009-2010 Pontiac Vibe vehicles.  These vehicles are susceptible to a failure in the Flexible Flat Cable ("FFC") in the spiral cable assemble connecting the driver's airbag module.  When the FFC fails, connectivity to the driver's airbag module is lost and the airbag is deactivated.  The resultant failure of the driver's airbag to deploy increases the risk of injury to the driver in the event of a crash.

168.  **Windshield wiper defect:**  On May 14, 2014, GM recalled 19,225 MY 2014 Cadillac CTS vehicles.  A defect leaves the windshield wipers in these vehicles prone to failure.  Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.

169.  **Brake rotor defect:**  On May 7, 2014, GM recalled 8,208 MY 2014 Chevrolet Malibu and Buick LaCrosse vehicles.  In these vehicles, GM may have accidentally installed rear brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.  The detachment of a break pad from the caliper can cause a sudden reduction in braking which lengthens the distance required to stop the vehicle and increases the risk of a crash.

170.   **Passenger-side airbag defect:**  On May 16, 2014, GM recalled 1,402 MY 2015 Cadillac Escalade vehicles.  In these vehicles, the airbag module is secured to a chute adhered to the backside of the instrument panel with an insufficiently heated infrared weld.  As a result, the front passenger-side airbag may only partially deploy in the event of crash, and this will increase the risk of occupant injury.  These vehicles do not conform to Federal Motor Vehicle Safety Standard number 208, "Occupant Crash Protection."

171.   **Electronic stability control defect:**  On March 26, 2014, GM recalled 656 MY 2014 Cadillac ELR vehicles.  In these vehicles, the electronic stability control (ESC) system software may inhibit certain ESC diagnostics and fail to alert the driver that the ESC system is partially or fully disabled.  Therefore, these vehicles fail to conform to Federal Motor Vehicle Safety Standard number 126, "Electronic Stability Control Systems."  A driver who is not alerted to an ESC system malfunction may continue driving with a disabled ESC system.  That may result in the loss of directional control, greatly increasing the risk of a crash.

172.   **Steering tie-rod defect:**  On May 13, 2014, GM recalled 477 MY 2014 Chevrolet Silverado, 2014 GMC Sierra and 2015 Chevrolet Tahoe vehicles.  In these vehicles, the tie-rod threaded attachment may not be properly tightened to the steering gear rack.  An improperly tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and result in a loss of steering that greatly increases the risk of a vehicle crash.

173.   **Automatic transmission shift cable adjuster:**  On February 20, 2014, GM recalled 352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Verano, Chevrolet Cruze, Chevrolet Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles.  In these vehicles, the transmission shift cable adjuster may disengage from the transmission shift lever.  When that happens, the driver may be unable to shift gears, and the indicated gear position may not be accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the

driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not be in the "PARK" gear position. That creates the risk that the vehicle will roll away as the driver and other occupants exit the vehicle, or anytime thereafter.

174. **Fuse block defect**: On May 19, 2014, GM recalled 58 MY 2015 Chevrolet Silverado HD and GMC Sierra HD vehicles. In these vehicles, the retention clips that attach the fuse block to the vehicle body can become loose allowing the fuse block to move out of position. When this occurs, exposed conductors in the fuse block may contact the mounting studs or other metallic components, which in turn causes a "short to ground" event. That can result in an arcing condition, igniting nearby combustible materials and starting an engine compartment fire.

175. **Diesel transfer pump defect**: On April 24, 2014, GM recalled 51 MY 2014 GMC Sierra HD and 2015 Chevrolet Silverado HD vehicles. In these vehicles, the fuel pump connections on both sides of the diesel fuel transfer pump may not be properly torqued. That can result in a diesel fuel leak, which can cause a vehicle fire.

176. **Base radio defect**: On June 5, 2014, GM recalled 57,512 MY 2014 Chevrolet Silverado LD, 2014 GMC Sierra LD and model year 2015 Silverado HD, Tahoe and Suburban and 2015 GMC Sierra HD and Yukon and Yukon XL vehicles because the base radio may not work. The faulty base radio prevents audible warnings if the key is in the ignition when the driver's door is open, and audible chimes when a front seat belt is not buckled. Vehicles with the base radio defect are out of compliance with motor vehicle safety standards covering theft protection, rollaway protection and occupant crash protection.

177. **Shorting bar defect**: On June 5, 2014, GM recalled 31,520 MY 2012 Buick Verano and Chevrolet Camaro, Cruze and Sonic compact cars for a defect in which the shorting bar inside the dual stage driver's air bag may occasionally contact the air bag terminals. If contact occurs, the air bag warning light will illuminate. If

the car and terminals are contacting each other in a crash, the air bag will not deploy. GM admits awareness of one crash with an injury where the relevant diagnostic trouble code was found at the time the vehicle was repaired. GM is aware of other crashes where air bags did not deploy but it does not know if they were related to this condition. GM conducted two previous recalls for this condition involving 7,116 of these vehicles with no confirmed crashes in which this issue was involved.

178. **Front passenger airbag end cap defect**: On June 5, 2014, GM recalled 61 model year 2013-2014 Chevrolet Spark and 2013 model year Buick Encores manufactured in Changwon, Korea from December 30, 2012, through May 8, 2013, because the vehicles may have a condition in which the front passenger airbag end cap could separate from the airbag inflator. In a crash, this may prevent the passenger airbag from deploying properly.

179. **Sensing and Diagnostic Module ("SDM") defect**: On June 5, 2014, GM recalled 33 model year 2014 Chevrolet Corvettes in the U.S. because an internal short-circuit in the sensing and diagnostic module ("SDM") could disable frontal air bags, safety belt pretensioners and the Automatic Occupancy Sensing module.

180. **Sonic Turbine Shaft**: On June 11, 2014, GM recalled 21,567 Chevrolet Sonics due to a transmission turbine shaft that can malfunction.

181. **Electrical System defect**: On June 11, 2014, GM recalled 14,765 model year 2014 Buick LaCrosse sedans because a wiring splice in the driver's door can corrode and break, cutting power to the windows, sunroof, and door chime under certain circumstances.

182. **Seatbelt Tensioning System defect**: On June 11, 2014, GM recalled 8,789 model year 2004-11 Saab 9-3 convertibles because a cable in the driver's seatbelt tensioning system can break.

183. In light of GM's history of concealing known defects, there is little reason to think that either GM's recalls have fully addressed the 35 recently revealed defects or that GM has addressed each defect of which it is or should be aware.

## C. GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees to Conceal Safety Issues

184. Recently revealed information presents a disturbing picture of GM's approach to safety issues – both in the design and manufacture stages, and in discovering and responding to defects in GM-branded vehicles that have already been sold.

185. GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

186. One "directive" at GM was "cost is everything."[61] The messages from top leadership at GM to employees, as well as their actions, were focused on the need to control cost.[62]

187. One GM engineer stated that emphasis on cost control at GM "permeates the fabric of the whole culture.'"[63]

188. According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at GM "emphasized timing over quality."[64]

189. GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues. For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost

---

[61] GM Report at 249.

[62] *Id*. at 250.

[63] *Id*.

[64] *Id*.

and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.[65]

190.   As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[66]

191.   Because of GM's focus on cost-cutting, GM Engineers did not believe they had extra funds to spend on product improvements.[67]

192.   GM's focus on cost-cutting also made it harder for GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

193.   GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[68]  From the date of its inception in 2009, TREAD has been the principal database used by GM to track incidents related to its vehicles.[69]

194.   From 2003-2007 or 2008, the TREAD Reporting team had eight employees, who would conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[70]

195.   In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to three employees, and the monthly data mining process pared down.[71]  In 2010, GM restored two people to the team, but they did not participate in the TREAD

---

[65] *Id.*

[66] *Id.* at 251.

[67] *Id.*

[68] *Id.* at 306.

[69] *Id.*

[70] *Id.* at 307.

[71] *Id.*

database searches.[72]  Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[73]

196.   By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, GM helped to insure that safety issues would not come to light.

197.   "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[74]

198.   GM CEO Mary Barra experienced instances where GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[75]

199.   GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[76]

200.   GM "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[77]

201.   So, for example, GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") it sometimes sent to dealers about issues in GM-branded vehicles.  According to Steve Oakley, who drafted a TSB in connection with the ignition switch defects, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which

_____

[72] *Id*. at 307-308.
[73] *Id*. at 208.
[74] *Id*. at 252.
[75] *Id*.
[76] *Id*. at 252-253.
[77] *Id*. at 253.

suggests GM should recall the vehicle, not issue a bulletin."[78]  Other GM personnel

confirmed Oakley on this point, stating that "there was concern about the use of 'stall'

in a TSB because such language might draw the attention of NHTSA."[79]

202.   Oakley further noted that "he was reluctant to push hard on safety issues

because of his perception that his predecessor had been pushed out of the job for

doing just that."[80]

203.   Many GM employees "did not take notes at all at critical safety meetings

because they believed GM lawyers did not want such notes taken."[81]

204.   A GM training document released by NHTSA as an attachment to its

Consent Order sheds further light on the lengths to which GM went to ensure that

known defects were concealed.  It appears that the defects were concealed pursuant to

a company policy GM inherited from Old GM.

205.   The document consists of slides from a 2008 Technical Learning

Symposium for "designing engineers," "company vehicle drivers," and other

employees at Old GM.  On information and belief, the vast majority of employees

who participated in this webinar presentation continued on in their same positions at

GM after July 10, 2009.

206.   The presentation focused on recalls, and the "reasons for recalls."

207.   One major component of the presentation was captioned

"Documentation Guidelines," and focused on what employees should (and should not

say) when describing problems in vehicles.

208.   Employees were instructed to "[w]rite smart," and to "[b]e factual, not

fantastic" in their writing.

---

[78] *Id*. at 92.

[79] *Id*. at 93.

[80] *Id*.

[81] *Id*. at 254.

010440-11  693457 V1

209. Company vehicle drivers were given examples of comments to avoid, including the following: "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

210. In documents used for reports and presentations, employees were advised to avoid a long list of words, including: "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

211. In truly Orwellian fashion, the Company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

212. As NHTSA's Acting Administrator Friedman noted at the May 16, 2014, press conference announcing the Consent Order concerning the ignition switch defect, it was GM's company policy to avoid using words that might suggest the existence of a safety defect:

> GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

213. GM appears to have trained its employees to conceal the existence of known safety defects from consumers and regulators. Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was verboten at GM.

214. So institutionalized at GM was the "phenomenon of avoiding responsibility" that the practice was given a name: "the 'GM salute,'" which was "a

crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[82]

215. CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[83]

216. According to the GM Report prepared by Anton R. Valukas, part of the failure to properly correct the ignition switch defect was due to problems with GM's organizational structure.[84] Part of the failure to properly correct the ignition switch defect was due to a corporate culture that did not care enough about safety.[85] Part of the failure to properly correct the ignition switch defect was due to a lack of open and honest communication with NHTSA regarding safety issues.[86] Part of the failure to properly correct the ignition switch defect was due to improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[87] On information and belief, all of these issues also helped cause the concealment of and failure to remedy the many defects that have led to the spate of recalls in the first half of 2014.

**D.      GM's Fraudulent Concealment of the Defects Has Harmed Plaintiff and the Class**

217. GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety issues, has caused damage to Plaintiff and the Class.

218. A vehicle made by a reputable manufacturer of safe and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise

_____
[82] GM Report at 255.
[83] *Id*. at 256.
[84] *Id*. at 259-260.
[85] *Id*. at 260-61.
[86] *Id*. at 263.
[87] *Id*. at 264.

similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

219. A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

220. Purchasers and lessees of GM-branded vehicles after the July 10, 2009, inception of GM paid more for the vehicles than they would have had GM disclosed the many defects it had a duty to disclose in GM-branded vehicles. Because GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, Plaintiff and the Class did not receive the benefit of their bargain. And the value of all their vehicles has diminished as the result of GM's deceptive conduct.

221. On information and belief, an estimate of the diminished value in class vehicles is illustrated as follows:

| | |
|---|---|
| 2010 Chevy Camaro | $2,200 |
| 2011 Chevy Camaro | $1,600 |
| 2011 Saturn Astra | $1,600 |
| 2011 Pontiac Sunfire | $487 |
| 2011 Saturn Ion | $878 |
| 2011 Pontiac GTO | $1,300 |
| 2010 Saturn Sky | $2,600 |

222. If GM had timely disclosed the many defects as required by the TREAD Act, the law of fraudulent concealment, and California consumer laws set forth below, Class members' vehicles would be considerably more valuable than they are now. Because of GM's now highly publicized campaign of deception, and its

belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise would have been fair market value for the Affected Vehicles.

## V.    TOLLING OF THE STATUTES OF LIMITATION

223.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiff and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that GM did not report information within its knowledge to federal authorities (including NHTSA), its dealerships or consumers, nor would a reasonable and diligent investigation have disclosed that GM had information in its possession about the existence and dangerousness of numerous defects and opted to conceal that information until shortly before this action was filed, and nor would such an investigation have disclosed that GM valued cost-cutting over safety and actively discouraged its personnel from uncovering or raising safety issues.

224.    Instead of disclosing the myriad safety defects and disregard of safety of which it was aware, GM falsely represented that its vehicles were safe, reliable, and of high quality, and that it was a reputable manufacturer that stood behind GM-branded vehicles after they were sold.

225.    Because of the active concealment by GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## VI.    CLASS ALLEGATIONS

### A.    The Nationwide Class

226.    Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a Class initially defined as follows (the "Nationwide Class"):

> During the fullest period allowed by law, all persons in the United States who either (i) own or lease a new or used GM-branded vehicle sold between July 10, 2009, and April 1, 2014 (the "Affected Vehicles"), or (ii) sold an

Affected Vehicle at a diminished price on or after April 1, 2014. Excluded from the Class are owners and lessors of model year 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

227. The following vehicles, if sold between July 10, 2009 and April 1, 2014, are Affected Vehicles:

| MY 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS | Aura | G3 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Aura Hybrid | G6 | H3 | 9-5 |
| Colorado | Lucerne | Envoy | DTS | Outlook | G8 | | 9-7X |
| Corvette | | Savana Cargo Van | Escalade | VUE | Solstice | | |
| Equinox | | Sierra 1500 | Escalade ESV | VUE Hybrid | Torrent | | |
| Express Cargo Van | | Sierra 2500HD | Escalade EXT | | Vibe | | |
| Express Passenger | | Sierra 3500HD | Escalade Hybrid | | | | |
| Impala | | Yukon | SRX | | | | |
| Malibu | | Yukon XL | STS | | | | |
| Silverado 1500 | | | STS-V | | | | |
| Silverado 1500 Hybrid | | | XLR | | | | |
| Silverado 3500HD | | | XLR-V | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Trailblazer | | | | | | | |
| Traverse | | | | | | | |
| Impala Police | | | | | | | |
| MY 2010 | | | | | | | |
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS Sedan | Aura | G6 | H2 | 9-3 |
| Aveo | LaCrosse | Canyon | CTS-V | Outlook | Vibe | H3 SUV | 9-5 |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | VUE | | H3T | |
| Colorado | | Sierra 1500 | DTS | | | | |
| Corvette | | Sierra 2500HD | Escalade | | | | |
| Equinox | | Sierra 3500HD | Escalade ESV | | | | |
| Express Cargo Van | | Terrain | Escalade EXT | | | | |
| Express Passenger | | Yukon | Escalade Hybrid | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Impala | | Yukon XL | SRX | | | | |
| Malibu | | | STS | | | | |
| Malibu Hybrid | | | | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |

| MY 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Aveo | LaCrosse | Canyon | CTS Sedan | | | | |
| Camaro | Lucerne | Savana Cargo Van | CTS Wagon | | | | |
| Caprice Police Patrol Vehicle | Regal | Sierra 1500 | CTS-V Coupe | | | | |
| Colorado | | Sierra 2500HD | CTS-V Sedan | | | | |
| Corvette | | Sierra 3500HD | CTS-V Wagon | | | | |
| Cruze | | Terrain | DTS | | | | |
| Equinox | | Yukon | Escalade | | | | |
| Express Cargo Van | | Yukon XL | Escalade ESV | | | | |
| Express Passenger | | | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | STS | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| Impala Police | | | | | | | |

010440-11  693457 V1

| MY 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | CTS Coupe | N/A | N/A | N/A | N/A |
| Camaro | LaCrosse | Canyon | CTS Sedan | | | | |
| Captiva Sport Fleet | Regal | Savana Cargo Van | CTS Wagon | | | | |
| Colorado | Verano | Sierra 1500 | CTS-V Coupe | | | | |
| Corvette | | Sierra 2500HD | CTS-V Sedan | | | | |
| Cruze | | Sierra 3500HD | CTS-V Wagon | | | | |
| Equinox | | Terrain | Escalade | | | | |
| Express Cargo Van | | Yukon | Escalade ESV | | | | |
| Express Passenger | | Yukon XL | Escalade EXT | | | | |
| Impala | | | Escalade Hybrid | | | | |
| Malibu | | | SRX | | | | |
| Silverado 1500 | | | | | | | |
| Silverado 1500 Hybrid | | | | | | | |
| Silverado 2500HD | | | | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| MY 2013 | | | | | | | |
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Avalanche | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Camaro | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Captiva Sport Fleet | LaCrosse | Sierra 1500 | CTS Sedan | | | | |
| Corvette | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Cruze | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Equinox | | Terrain | CTS-V Sedan | | | | |
| Express Cargo Van | | Yukon | CTS-V Wagon | | | | |
| Express Passenger | | Yukon  XL | Escalade | | | | |
| Impala | | | Escalade ESV | | | | |
| Malibu | | | Escalade EXT | | | | |
| Silverado 1500 | | | Escalade Hybrid | | | | |

010440-11  693457 V1

| CHEVROLET | BUICK | GMC | CADILLAC | SATURN | PONTIAC | HUMMER | SAAB |
|---|---|---|---|---|---|---|---|
| Silverado 1500 Hybrid | | | SRX | | | | |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Tahoe Hybrid | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| **MY 2014** | | | | | | | |
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Camaro | Enclave | Acadia | ATS | N/A | N/A | N/A | N/A |
| Captiva Sport Fleet | Encore | Savana Cargo Van | CTS Coupe | | | | |
| Corvette Stingray | LaCrosse | Sierra 1500 | CTS Sedan | | | | |
| Cruze | Regal | Sierra 2500HD | CTS Wagon | | | | |
| Equinox | Verano | Sierra 3500HD | CTS-V Coupe | | | | |
| Express Cargo Van | | Terrain | CTS-V Sedan | | | | |
| Express Passenger | | Yukon | CTS-V Wagon | | | | |
| Impala | | Yukon XL | ELR | | | | |
| Impala Limited | | | Escalade | | | | |
| Malibu | | | Escalade ESV | | | | |
| Silverado 1500 | | | SRX | | | | |
| Silverado 2500HD | | | XTS | | | | |
| Silverado 3500HD | | | | | | | |
| Sonic | | | | | | | |
| Spark | | | | | | | |
| Spark EV | | | | | | | |
| SS | | | | | | | |
| Suburban | | | | | | | |
| Tahoe | | | | | | | |
| Traverse | | | | | | | |
| Volt | | | | | | | |
| **MY 2015** | | | | | | | |
| **CHEVROLET** | **BUICK** | **GMC** | **CADILLAC** | **SATURN** | **PONTIAC** | **HUMMER** | **SAAB** |
| Camaro | Enclave | Acadia | ATS Coupe | N/A | N/A | N/A | N/A |

010440-11  693457 V1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Captiva Sport Fleet | LaCrosse | Savana Cargo Van | ATS Sedan | | | | | |
| City Express Cargo Van | Regal | Sierra 2500HD | CTS Sedan | | | | | |
| Equinox | | Sierra 3500HD | CTS-V Coupe | | | | | |
| Express Cargo Van | | Terrain | ELR | | | | | |
| Express Passenger | | Yukon | Escalade | | | | | |
| Impala | | Yukon XL | Escalade ESV | | | | | |
| Impala Limited | | | SRX | | | | | |
| Malibu | | | XTS | | | | | |
| Silverado 2500HD | | | | | | | | |
| Silverado 3500HD | | | | | | | | |
| Spark | | | | | | | | |
| Spark EV | | | | | | | | |
| Suburban | | | | | | | | |
| Tahoe | | | | | | | | |
| Traverse | | | | | | | | |
| Volt | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## B.     California Class

228.    Plaintiff also alleges claims under California state law on behalf of a Class of California State residents (the "California Class"), initially defined as follows:

> During the fullest period allowed by law all persons or entities in the State of California who either (i) own or lease one or more Affected Vehicle(s) or (ii) sold an Affected Vehicle on or after April 1, 2014.  Excluded from the Class are owners and lessors of model year 2005 -2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

229.    Excluded from each Class are Old GM and GM, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; class counsel and their employees; and

the judicial officers and their immediate family members and associated court staff
assigned to this case, and all persons within the third degree of relationship to any
such persons.

230. Plaintiff is informed and believes that there are at least millions of
Affected Vehicles nationwide and hundreds of thousands of Affected Vehicles in
California. Individual joinder of all Class members is impracticable.

231. The Class can be readily identified using registration records, sales
records, production records, and other information kept by GM or third parties in the
usual course of business and within their control.

232. Questions of law and fact are common to the Class and predominate over
questions affecting only individual members, including the following:

        a.     Whether numerous GM vehicles suffer from serious defects;

        b.     Whether GM was aware of many or all of the defects, and
concealed the defects from regulators, Plaintiff, and the Class;

        c.     Whether GM misrepresented to Affected Vehicle purchasers that
GM vehicles are safe, reliable, and of high quality;

        d.     Whether GM misrepresented itself as a reputable manufacturer
that values safety and stands behind its vehicles after they are sold;

        e.     Whether GM actively encouraged the concealment of known
defects from regulators and consumers;

        f.     Whether GM engaged in fraudulent concealment;

        g.     Whether GM engaged in unfair, deceptive, unlawful, and/or
fraudulent acts or practices in trade or commerce by failing to disclose that many
GM-branded vehicles had serious defects;

        h.     Whether the alleged conduct by GM violated laws as Plaintiff
alleges;

        i.     Whether GM's unlawful, unfair, fraudulent, and/or deceptive
practices harmed Plaintiff and the members of the Class;

j.     Whether Plaintiff and the members of the Class are entitled to equitable and/or injunctive relief; and

k.     Whether any or all applicable limitations periods are tolled by acts of fraudulent concealment.

233.   Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by GM.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

234.   Plaintiff will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiff is represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

235.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

236.   The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

237.   Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

010440-11  693457 V1

# VII. CAUSES OF ACTION

## A. Nationwide Class Claim

### COUNT I

### FRAUDULENT CONCEALMENT

238. Plaintiff and the Class incorporate by reference each preceding and following paragraph as though fully set forth at length herein.

239. This claim is brought on behalf of the Nationwide Class.

240. GM concealed and suppressed material facts concerning the quality of its vehicles and the GM brand.

241. GM concealed and suppressed material facts concerning the culture of GM – a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

242. GM concealed and suppressed material facts concerning the many serious defects plaguing GM-branded vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

243. GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that GM was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable. The false representations were material to consumers, both because they concerned the quality and safety of the Affected Vehicles and because they played a significant role in the value of the vehicles.

244. GM had a duty to disclose the many defects in GM-branded vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew the facts were not known to or reasonably discoverable by Plaintiff and the Class. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiff and the Class. Whether a manufacturer's products are safe and

010440-11  693457 V1

reliable, and whether that manufacturer stands behind its products, is a material concern to a consumer.

245. GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and it did so at the expense of Plaintiff and the Class.

246. On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiff and the Class and conceal material information regarding defects that exist in GM-branded vehicles.

247. Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class's actions were justified. GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Class.

248. Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value as a result of GM's concealment of, and failure to timely disclose, the serious defects in millions of GM-branded vehicles and the serious safety and quality issues engendered by GM's corporate policies. Had they been aware of the many defects that existed in GM-branded vehicles, the Company's disregard for safety, Plaintiff either would have paid less for her vehicle or would not have purchased it at all. She did not receive the benefit of her bargain as a result of the fraudulent concealment of GM.

249. The value of all Class members' vehicles has diminished as a result of GM's fraudulent concealment of the many defects which has greatly tarnished the GM brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

250. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-

- 59 -

being to enrich GM.  GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**B.    California Class Claims**

**COUNT II**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**

**(CAL. CIV. CODE § 1750, *et seq.*)**

251.    Plaintiff Anna Andrews (in this Count referred to as "Plaintiff") brings this claim solely on behalf of Class members who are residents of California (the "California Class," in this Count referred to as the "Class").

252.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

253.    GM is a "person" under CAL. CIV. CODE § 1761(c).

254.    Plaintiff and the Class are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Affected Vehicles.

255.    GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*, as described above and below.

256.    Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

257.    In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all GM-branded vehicles manufactured by Old GM.

258.    Under the TREAD Act, if it is determined that a vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers, and dealers of the defect, and may be ordered to remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

010440-11  693457 V1

259. Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

260. The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

261. From the date of its inception on July 10, 2009, GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at GM and continuous reports, investigations, and notifications from regulatory authorities. GM became aware of other serious defects years ago, but concealed all of them until recently.

262. GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy defects in all GM-branded vehicles.

263. According to a recent report from the Center for Auto Safety, some 2,004 deaths and injuries are connected with recently recalled GM-branded vehicles, and GM should have recalled the vehicles years ago.

264. By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, GM engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq*.

265. Though required to by the TREAD Act, GM failed for many years to inform NHTSA about known defects in GM-branded vehicles. Consequently, the public, including Plaintiff and the Class, received no notice of the many defects and their drastic consequences.

266. GM owed Plaintiff and the Class a duty to comply with the TREAD Act and disclose the many defects plaguing GM-branded vehicles, because GM:

    a.    Possessed exclusive knowledge of the defects rendering the GM-branded vehicles inherently more dangerous, unreliable and less valuable than otherwise similar vehicles;

    b.    Intentionally concealed the hazards facing GM-branded vehicle owners by failing to comply with the TREAD Act, which required the disclosure of the defects;

    c.    GM marketed all of its vehicles as safe, reliable, and high quality in order to entice Plaintiff and the Class to purchase the Affected Vehicles; and

    d.    Whether or not a manufacture is reputable, makes safe and reliable vehicles, and stands behind its vehicles after they are sold was highly material information to Plaintiff and the Class.

267. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability

of GM-branded vehicles, the quality of the GM brand, the devaluing of safety at GM, and the true value of the Affected Vehicles.

268. Because of its violations of the CLRA detailed above, GM caused actual damage to Plaintiff and the Class. GM's violations caused the diminution in value of the Class members' vehicles which are now worth less than they would have been had GM timely disclosed the defects. Because GM fraudulently concealed the many defects in GM-branded vehicles resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by GM's conduct, they are now worth significantly less than they otherwise would be.

269. Plaintiff sent a CLRA Notice Letter to GM on June 11, 2014. After thirty days, Plaintiff will, under CAL. CIV. CODE § 1780(a), seek monetary relief against GM measured as the diminution of the value of their vehicles caused by GM's violations of the CLRA as alleged herein.

270. Under CAL. CIV. CODE § 1780(b), Plaintiff will seek an additional award against GM of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. GM knew or should have known that its conduct was directed to one or more Class members who are senior citizens or disabled persons. GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Class members who are senior citizens or disabled persons are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

271. Plaintiff will also seek punitive damages against GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and

safety of others, subjecting Plaintiff and the Class to potential cruel and unjust hardship as a result. GM intentionally and willfully concealed and failed to inform NHTSA of over 17 million unsafe and unreliable vehicles. Further, GM deceived Plaintiff by concealing material facts that only it knew concerning its valuation of cost-cutting over safety and its encouragement to employees to conceal safety issues, all to boost its sales and avoid the expense and public relations problem of correcting serious flaws in millions of GM-branded vehicles. GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

272. Plaintiff further seeks an order enjoining unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

273. Plaintiff includes an affidavit with this Complaint that shows that venue in this District is proper, to the extent such an affidavit is required by CAL. CIV. CODE § 1780(d).

## COUNT III

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

274. Plaintiff Anna Andrews (in this Count referred to as "Plaintiff") brings this claim solely on behalf of Class members who are residents of California (the "California Class," in this Count referred to as the "Class").

275. Plaintiff realleges and incorporates by reference all the preceding and following paragraphs as though fully set forth herein.

276. California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

277. GM violated the unlawful prong of section 17200 by its violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set forth in California Class Count II and by the acts and practices set forth in this Complaint.

278. GM also violated the unlawful prong because it engaged in business acts or practices that are unlawful because they violate the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its regulations.

279. GM violated the TREAD Act when it failed to timely inform NHTSA of the many defects in GM-branded vehicles.

280. GM violated the unfair and fraudulent prong of section 17200 because, in failing or refusing to: (i) inform NHTSA and consumers about the myriad serious defects affecting the safety and reliability of more than 17 million GM-branded vehicles; (ii) inform consumers about GM's devaluation of safety, its cost-cutting and discouragement of raising safety issues; while (iii) marketing its vehicles as safe and reliable, GM precluded reasonable consumers from discovering that GM was a disreputable manufacturer of unsafe and unreliable vehicles, and did not stand behind its vehicles once they were purchased. The information that GM was required to disclose concerning the many known and serious defects in GM-branded vehicles was material to a reasonable consumer.

281. GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease or purchase the Affected Vehicles.

282. Plaintiff and the Class have suffered an injury, including the loss of money or property, because of GM's unfair, unlawful, and/or deceptive practices. GM failed to inform NHTSA, and therefore failed to inform consumers, that more than 17 million GM-branded vehicles had serious defects, all in violation of Section

1   17200 of the UCL.  GM also misrepresented itself as a reputable manufacturer that

2   valued safety when in fact just the opposite was true.  These violations caused the

3   diminution in value of Class members' vehicles which are now worth less than they

4   would have been had GM timely disclosed the many defects.  Because GM

5   fraudulently concealed the defects and its irresponsible and fraudulent practices

6   concerning safety, resulting in a raft of negative publicity once the defects finally

7   began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In

8   light of GM's conduct and the stigma now thereby attached to the Affected Vehicles,

9   their value has plummeted.

10          283.   Further, Class members did not receive the benefit of their bargain and

11  overpaid for their vehicles as a result of GM's unfair and deceptive conduct in

12  violation of the TREAD Act, the CLRA, and Section 17200 of the UCL.  Had these

13  Class members been aware that GM was concealing serious defects in more than 17

14  million GM-branded vehicles and systematically devalued safety, they would have

15  either paid less for their Affected Vehicles or would not have purchased the vehicles

16  at all.

17          284.   All of the wrongful conduct alleged herein occurred, and continues to

18  occur, in the conduct of GM's business.  GM's wrongful conduct is part of a pattern

19  or generalized course of conduct that is still perpetuated and repeated, both in

20  California and nationwide.

21          285.   Plaintiff and the Class have suffered an injury, including the loss of

22  money or property, due to GM's unfair, unlawful, and/or deceptive practices.

23          286.   Plaintiff requests that this Court enter such orders or judgments as may

24  be necessary, including a declaratory judgment that GM has violated the UCL; an

25  order enjoining GM from continuing its unfair, unlawful, and/or deceptive practices;

26  an order and judgment restoring to the Class members any money lost as a result of

27  unfair, unlawful, and deceptive trade practices, including restitution and disgorgement

28  of any profits GM received as a result of its unfair, unlawful, and/or deceptive

practices, as provided in CAL. CIV. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

A.     Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class Representative and Plaintiff's chosen counsel as Class Counsel;

B.     Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C.     Award Plaintiff and Class members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.     Award Plaintiff and the Class members exemplary damages in such amount as proven;

E.     Award damages and other remedies as allowed by the laws of the States as alleged in the State Class counts;

F.     Award Plaintiff and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

G.     Award Plaintiff and the Class members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## IX.   JURY TRIAL DEMAND

Plaintiff requests a trial by jury on the legal claims, as set forth herein.

DATED: June 18, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

By:_____*/s/ Elaine T. Byszewski*_____
    Elaine T. Byszewski, Cal. Bar No. 222304
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
E-mail: elaine@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Andrew M. Volk (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: andrew@hbsslaw.com

Robert B. Carey (*pro hac vice pending*)
Rachel E. Freeman (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-mail: rob@hbsslaw.com
E-mail: michellak@hbsslaw.com

Mark P. Robinson, Jr. (SBN 054426)
Kevin F. Calcagnie (SBN 108994)
Scot D. Wilson (SBN 223367)
ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
E-mail: mrobinson@rcrsd.com

1  Elaine T. Byszewski (SBN 222304)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  301 North Lake Avenue, Suite 203
   Pasadena, CA 91101
3  Telephone: (213) 330-7150
   Facsimile: (213) 330-7152
4  E-mail: elaine@hbsslaw.com

5  Steve W. Berman (*pro hac vice pending*)
   Andrew M. Volk (*pro hac vice pending*)
6  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
7  Seattle, WA 98101
   Telephone: (206) 623-7292
8  Facsimile: (206) 623-0594
   E-mail: steve@hbsslaw.com
9  E-mail: andrew@hbsslaw.com

10 Mark P. Robinson, Jr. (SBN 054426)
   Kevin F. Calcagnie (SBN 108994)
11 Scot D. Wilson (SBN 223367)
   ROBINSON CALCAGNIE ROBINSON
12 SHAPIRO DAVIS, INC.
   19 Corporate Plaza
13 Newport Beach, CA 92660
   Telephone: (949) 720-1288
14 Facsimile: (949) 720-1292
   mrobinson@rcrsd.com
15
   *Attorneys for Plaintiff*
16

17                 UNITED STATES DISTRICT COURT

18                CENTRAL DISTRICT OF CALIFORNIA

19 ANNA ANDREWS, individually and on    | Case No.:
   behalf of all others similarly situated,
20                                        | **CLASS ACTION**
                              Plaintiff,
21    v.
                                          | **ANDREWS DECLARATION**
22 GENERAL MOTORS LLC,                    | **RE: CLRA VENUE**
                             Defendant.
23                                        | **JURY TRIAL DEMANDED**

24

25

26

27

28

I, Anna Andrews, hereby declare and state as follows:

1. I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2. I am a Plaintiff in the above-entitled action.

3. Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4. This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendant does business in this District (the Central District of California) and throughout the State of California.

5. The Complaint filed in this matter contains causes of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6. I own a 2010 Buick LaCrosse which I purchased used in Cathedral City, California on August 25, 2011.

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of La Quinta , California, on June  11 , 2014.

By _Anna M. Andrews_
Anna Andrews